## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

JOE HAND PROMOTIONS, INC.,

        Plaintiff,

v.                                         Civ. No. 13-1191 MV/GBW

SUSAN HAMILTON-DICK, Individually,
and as an officer, director, shareholder, and/or
principal d/b/a GOOBER MCCOOLS, 1605
South Avenue D, Portales, NM 88130, and
GOOBER MCCOOLS, 1604 South Avenue D,
Portales, NM 88130,

        Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, [Doc. 18], filed April 18, 2014. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the motion for summary judgment is well taken in part and will be granted in part.

### BACKGROUND[1]

Plaintiff Joe Hand Promotions, Inc., which is the exclusive domestic commercial distributor of the transmission signal of the fight program known as "UFC 145: Jones v. Evans Broadcast" ("the fight"), filed its complaint on December 16, 2013, alleging that Defendants

---

[1] Plaintiff does not dispute the facts set forth herein. Instead, Plaintiff contends that Defendants' facts cannot support the entry of summary judgment because they are contained solely in a self-serving affidavit by Defendant Hamilton-Dick. Because the Court denies summary judgment on the alternative ground that Defendants' facts, even if true, fail as a matter of law to absolve them of liability under 47 U.S.C. Section 553, the Court declines to consider Plaintiff's challenge to Hamilton-Dick's affidavit.

Susan D. Hamilton-Dick and Goober McCools violated the Federal Cable Communications Policy Act (the "Act"), as amended, *see* 47 U.S.C. §§ 553(a)(1), 605(a), when they broadcast the fight on April 21, 2012, at Goober McCools.   Goober McCools is a commercial establishment engaged in the lawful business of alcohol sales by the drink and package sales for off premises consumption.

Goober McCools was a subscriber of Comcast Cable on the night it broadcast the fight and had been a subscriber of Comcast Cable for the eleven years preceding its broadcast of the fight. Goober McCools' Comcast Cable account was in Goober McCool's name and was registered at Goober McCool's commercial address.   [Doc. 18-1].   Goober McCools ordered the fight on its cable account and paid Comcast Cable a residential fee of $44.99 for the fight.   Comcast Cable sent Goober McCools an invoice for the fight and Goober McCools paid the bill in full on May 23, 2012.

Defendants were not aware of any limitations on Comcast Cable's ability to provide the fight to commercial customers.   On April 21, 2012, Goober McCools did not charge a cover fee to patrons, Goober McCools did not charge a premium for food or drink, Goober McCools did not receive increased profits, and Goober McCools did not otherwise achieve any commercial gain as a result of the exhibition of the fight.   Defendants did not misrepresent to Comcast Cable, Plaintiff, or any other third parties the location at which Goober McCools received Comcast's cable services or the purpose of receiving cable services on April 21, 2012.

## **STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c); *see Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290

(10th Cir. 1999).   Under Rule 56(c), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).   Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.   *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted).   The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."   *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."   *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).   If the responding party fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).   Upon a motion for summary judgment, a district court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all

3

reasonable inferences to be drawn from the evidence."   *Kaus v. Standard Ins. Co*., 985 F. Supp.

1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).

## DISCUSSION

Plaintiff alleges that Defendants Hamilton-Dick and Goober McCools violated the Federal

Cable Communications Policy Act, 47 U.S.C. §§ 553(a)(1), 605, when they broadcast the Jones

versus Evans fight from Goober McCools on the evening of April 21, 2012, without obtaining a

commercial license from the exclusive license holder Plaintiff Joe Hand Promotions.   Section

553(a)(1) of the Act provides that "[n]o person shall intercept or receive . . . any communications

service offered over a cable system, unless specifically authorized to do so by a cable operator."

47 U.S.C. § 553(a)(1).   Section 605 of the Act provides that "[n]o person not being authorized by

the sender shall intercept any radio communication and divulge or publish . . . the contents . . . of

such intercepted communications to any person."   47 U.S.C. § 605(a).   Defendants move for

summary judgment on the ground that Plaintiff cannot recover under both Sections 553 and 605,

but rather can seek recovery under only one of the two statutes, and on the ground that Defendants

did not violate Section 553 because Comcast Cable specifically authorized them to receive and

broadcast the fight.   The Court addresses Defendants' arguments in turn.

I.   <u>Defendants are Entitled to Summary Judgment on Plaintiff's Section 605 Claim Because
     that Section does not Apply to Cable Transmissions.</u>

The Court grants Defendants' request for summary judgment on Plaintiff's claim under 47

U.S.C. Section 605.   A majority of courts have held that Section 605 applies only to satellite and

radio transmissions and not to transmissions by cable.   *See, e.g.*, *Charter Communications*

*Entertainment I, DST v. Burdulis*, 460 F.3d 168, 173 (1st Cir. 2006); *J & J Sports Productions, Inc.*

*v. Mandell Family Ventures, LLC*, 751 F.3d 346, 353 (5th Cir. 2014); *U.S. v. Norris*, 88 F.3d 462,

469 (7th Cir. 1996); *Joe Hand Promotions, Inc. v. Kinder*, No. 11-CV-450-GKF-PJC, 2012 U.S. Dist. LEXIS 162738, *8 (N.D. Okla. Nov. 13, 2012). This Court joins that majority and holds that, because Plaintiff alleges that Defendants unlawfully received a cable transmission, and not a satellite or radio transmission, Defendants are entitled to summary judgment on Plaintiff's Section 605 claim.

II.     Defendants are not Entitled to Summary Judgment on Plaintiff's Section 553 Claim Because a Question of Fact Remains Whether Defendants were "Specifically Authorized" to Exhibit the Fight.

The Court denies Defendants' request for summary judgment in their favor on Plaintiff's 47 U.S.C. Section 553 claim. To establish liability under Section 553(a)(1), a plaintiff must prove that the defendant "intercept[ed] or receive[d] or assist[ed] in intercepting or receiving any communications service offered over a cable system." 47 U.S.C. § 553(a)(1); *see also Kinder*, 2012 U.S. Dist. LEXIS 162738, at * 9. The final clause of Section 553(a)(1) contains a safe harbor[2] providing an exemption for persons "specifically authorized" to receive a communication by a "cable operator." *See* 47 U.S.C. § 553(a)(1) ("no person shall intercept or receive . . . any communications service offered over a cable system, *unless specifically authorized to do so by a cable operator*") (emphasis added). "It is not necessary for [a] plaintiff to establish 'willfulness' concerning the exhibition in order to establish liability" under Section 553. *Kinder*, 2012 U.S. Dist. LEXIS 162738, at *9 (citations omitted). Defendants invoke Section 553(a)(1)'s safe harbor and contend that they did not violate the Act because Comcast Cable "specifically authorized" them to receive and broadcast the fight.

The Court is not persuaded that Defendants have satisfied their summary judgment burden

---

2   *See Mandell Family Ventures*, 751 F.3d at 348 (explaining that Section 553(a)(1)'s language precluding the imposition of liability on defendants who were "specifically authorized to [receive cable communications] by a cable operator" is "often referred to as a safe harbor'").

of demonstrating, on the facts before the Court, that the safe harbor applies as a matter of law. While courts, including the Southern District of Ohio in *J & J Productions, Inc. v. Schmalz*, 745 F. Supp. 2d 844 (S.D. Ohio 2010), a case cited by Defendants, have interpreted Section 553's language "unless specifically authorized to do so by a cable operator" broadly to include cable operators that do not have the authority to grant a commercial establishment permission to broadcast a program,[3] other courts have interpreted that language more narrowly. The latter courts have held that Section 553's safe harbor does not apply to cable operators that do not have authority to grant a commercial license to view a program. These courts applying a narrow interpretation of the safe harbor hold commercial defendants liable for purchasing programming at a residential rate from a cable or satellite provider that does not have authority to sell the rights.

In *Schmalz*, for example, the case upon which Defendants rely, the Southern District of Ohio interpreted the safe harbor broadly and held that the defendants were not liable for violating Section 553. *See* 745 F. Supp. 2d at 851. The *Schmalz* court found that a bar owner did not violate Section 553(a)(1) when it ordered and paid for a program that the cable operator was not authorized to broadcast. *See id.* at 851. The court acknowledged that Section 553 was a strict liability statute but explained that the court nevertheless must determine whether the statute in fact was violated. *Id.* at 850. The court concluded that the defendant bar owner had not violated the Act. *See id.* The court reasoned that Section 553(a)(1) provided liability for receipt of cable transmissions "unless specifically authorized to do so by a cable operator," and interpreted the safe harbor language to include authorization by a cable operator even if that operator did not have the

---

[3]  *See Schmalz* , 745 F. Supp.2d at 850-51; *see also J & J Sports Productions, Inc. v. J & J Keynote Lounge, Inc.*, No. 11-CV-15002, 2013 WL 1747803, *7 (E.D. Mich. Apr. 23, 2013) (explaining that in *Schmalz*, the district court interpreted "cable operator" to include cable operators who are not authorized to broadcast a program) (citing *Schmalz*, 745 F. Supp. 2d at 850-51).

authority to grant the permission. *See id.* (citing 47 U.S.C. § 553(a)(1); *see also J & J Sports Productions, Inc. v. J & J Keynote Lounge, Inc.*, No. 11-CV-15002, 2013 WL 1747803, *7 (E.D. Mich. Apr. 23, 2013) (discussing the court's holding in *Schmalz*). Because the plaintiff had received authorization from its cable operator, even if the cable operator did not have the authority to grant that permission, the court held that the plaintiff was not liable under Section 553(a)(1) because the safe harbor applied. *See id.* at 851.

The *Schmalz* court distinguished other cases cited by the plaintiff-licensor and reasoned that none of these cases involved the facts before the court. *See id.* at 850. The court explained, "None of the cases . . . involve commercial defendants, who through no fault of their own, received cable broadcasts which were only authorized to be broadcast by the cable operator to residential customers." *Id.* The court further distinguished the cases by explaining that the defendants (or those in privity with the defendants) took "proactive measures" to receive the cable service. *See id.* at 851. The court therefore concluded that the cases were inapplicable because the *Schmalz* defendants were specifically authorized by a cable operator to receive the broadcast and they were unaware that the cable operator was not authorized to transmit the broadcast to commercial clients. *Id.* The court explained that "[n]owhere in th[e] language [of the statute] is the term 'cable operator' qualified with language indicating that the cable operator must be an 'authorized' cable operator." *Id.* The court found the distinction relevant and held that "[g]iven the stated purpose of the Cable Communications Policy Act, to combat the increasingly occurring theft of cable service, we do not find that Defendants' conduct is the type of conduct which Congress intended to reach." *Id.*

In reaching this holding, the *Schmalz* court noted that "[a]t all times relevant, Defendants were listed as a commercial customer, ordered the program as a commercial customer, [and] were

billed and paid for such service, as commercial customers," and that [a]t no time did Defendants

misrepresent their status as a commercial customer." *Id.*   On these facts, the court concluded that

> [i]t [wa]s entirely reasonable for Defendants, wishing to broadcast
> the fight in their establishment, to inquire as to the availability and
> pricing for such from its cable provider.  That [the provider] was
> not authorized to sell such rights to Defendants was not a fact of
> which Defendants were aware or should reasonably be expected to
> be aware.  It was [the cable provider's] responsibility under the
> terms of its licensing agreement to make Defendants aware that it
> was not authorized to sell such rights to Defendants and, if possible,
> to direct Defendants to the entity which did possess those rights.

*Id.*  For these reasons, the *Schmalz* court found that the defendants' conduct did not violate

Section 553.  *See id.*

Likewise, in *J & J Sports Productions, Inc. v. Mandell Family Ventures, LLC*, 751 F.3d

346 (5th Cir. 2014), the Fifth Circuit held that the safe harbor provision protects commercial

customers of a cable provider who pay a cable provider a pay-per-view fee in exchange for the

right to receive the broadcast of a program even though the cable provider was not authorized to

grant this permission and the license holder of the program, who was authorized to grant the

permission, did not provide it.  *See id.* at 348.  In *Mandell*, the plaintiff-licensor argued that a

cable operator cannot give authority to customers that a cable provider does not have.  *See id.* at

348 n.3.  The Fifth Circuit summarized this argument as, "in essence, . . . that a cable customer

who receives . . . authorization [from a cable operator] may still face liability under § 553 unless it

takes the additional step of ensuring that the cable operator itself is licensed to distribute the

various broadcasts that the customer views.   Interpreting the safe harbor in this highly restrictive

manner finds no support in the text of the statute."  *Id.* at 348-49.  The court reasoned, "The

statute does not hinge liability on the cable customer taking additional steps or the cable operator

being licensed to distribute a broadcast:   The exclusion from liability simply applies to those who

receive authorization from a cable operator."   *Id.* at 349 (citing *Schmalz*, 745 F. Supp. 2d at 851). Thus, the *Mandell* court "interpret[ed] the statute in accordance with its plain language," held that "liability under § 553(a)(1) does not extend to those who are 'specifically authorized . . . by a cable operator' to receive a broadcast," and therefore reversed the district court's grant of summary judgment in the plaintiff-licensor's favor.   *Id.*   In reaching its holding, the *Mandell* court also noted that the language of the service agreement between the cable provider and the defendants provided that the operator was obligated to ensure that the services it distributed to the defendants were authorized and made pursuant to the proper license.   *See id.* at 350.

The *Mandell* court distinguished various cases cited by the plaintiff-licensor in which the courts held that a lack of a cable provider's authority to grant authorization to a commercial customer rendered the safe harbor inapplicable.   *See id.* at 350 n.6.   The court explained that these cases were based upon contracts between defendants and a different cable operator (primarily Comcast Cable), and concluded that the cases were distinguishable because, among other reasons, the contracts notified the customers that the cable provider was *not* authorized to distribute pay-per-view programming to commercial customers and the contractors put the onus on commercial customers to obtain written authorization from the proper license holder in advance of exhibiting the program.   *See id.*   In addition, the *Mandell* court noted that the defendants submitted uncontroverted affidavits from the cable provider stating that the provider authorized the defendants to receive the programming for a residential fee despite the prohibition in the service agreements and that the provider was aware the defendant was a commercial establishment that held a commercial cable account.   *See id.*   Based upon this evidence, the Fifth Circuit concluded that "there is at least a dispute of material fact as to whether the Defendants violated § 553," and therefore held that the plaintiff-licensor failed to meet its summary judgment burden.

*Id.*

   While Defendants rely upon cases, such as *Schmalz*, which broadly construe the safe

harbor in Section 553, to support their contention that they are not liable under the safe harbor, not

surprisingly, Plaintiff relies upon the line of cases interpreting the safe harbor more narrowly and

ask the Court to hold Defendants liable for their broadcast of the fight despite the unauthorized

permission from Comcast Cable to do so.   Plaintiff contends that Comcast Cable could not

authorize Defendants to broadcast the fight when it did not have the actual authority to grant this

permission.

   In support of this contention, Plaintiff cites *J & J Sports Productions, Inc. v. Lopez*, No.

CIV-12-0258-HE, 2013 U.S. Dist. LEXIS 57678 (W.D. Okla. Apr. 23, 2013), in which the district

court considered and rejected the defendant's argument that she did not violate Federal Cable

Communications Policy Act because her satellite television provider authorized her to broadcast

the transmission in exchange for a fee.[4]   In *Lopez*, the plaintiff J & J Sports was granted the

exclusive nationwide television distribution rights to a championship fight, and J & J Sports, in

turn, entered into various sub-licensing agreements with different commercial entities, granting

them limited rights to exhibit the program publicly.   *See id.* at *3.   The defendants in *Lopez* did

not purchase a commercial license from J & J Sports but nonetheless broadcast the event on their

commercial premises.   *See id.*   The defendants argued they lawfully exhibited the program

because they purchased the show from their DirecTV representative who authorized them to

exhibit the fight.   *See id.* at *4.   The *Lopez* court rejected this argument, explaining that "[t]he

problem with defendants' argument is that they fail to offer any evidence that DirecTV was one of

---

[4]   Although *Lopez* involved an analysis of Section 605, and not 553, for purposes of the Court's
analysis, the provisions are substantially similar and *Lopez*'s reasoning is equally applicable.

plaintiff's sublicensees. . . .   While defendants may have been authorized by a DirecTV representative to broadcast the fight, the DirecTV representative did not have the authority to give them permission to broadcast it."   *Id.* at *5.   The court concluded that "the violation of the statute may not have been willful," but that "that is not a defense."   *Id.* (citation omitted).   "Lack of intent or knowledge may reduce damages," but court explained, but not negate liability.   *See id.* at *5-6.

Several courts have reached the same conclusion.   These courts hold commercial defendants liable for violating Section 553, even though they paid a fee to their cable providers in exchange for the right to receive the broadcast.   The courts pin liability on the fact that the cable providers did not have the authority to grant the defendants permission to broadcast the programming and the defendants failed to purchase commercial licenses from the plaintiffs that did have the actual authority.   *See, e.g., Nat'l Satellite Sports, Inc. v. Time Warner Entertainment Co.* 217 F. Supp. 2d 466, 468 (S.D.N.Y. 2002) ("For a cable operator lawfully permitted to broadcast a fight to residential customers to allow its services to permit commercial establishments to tap-in to the broadcast without paying the party that holds the exclusive right to broadcast the fight commercially is not an authorization a cable operator can give, under § 553 or otherwise"); *Kinder*, 2012 U.S. Dist. Lexis, at *10 (holding that a commercial satellite customer was strictly liable under Section 605 even though the customer paid a residential fee to its satellite provider because the customer was required to pay the fee to the exclusive license holder); *J & J Sports Prod., Inc. v. Aguilar*, No. CIV-12-467, 2013 U.S. Dist. LEXIS 13951, *2-3 (W.D. Okla. Feb. 1, 2013) (rejecting the defendant's argument that it did not willfully violate Sections 605 and 553, explaining that the statutes impose strict liability, and holding that because the defendant admitted she broadcast the fight in her bar, that she did not purchase a commercial license, and that the

plaintiff had exclusive licensing rights for the fight, it was undisputed that the defendant violated sections 605 and 553 by intercepting and exhibiting the program licensed to the plaintiff without paying the plaintiff the required fees); *Kingvision Pay Per View, Ltd. v. Williams*, 1 F. Supp. 2d 1481, 1485 (S.D. Ga. 1998) (rejecting the defense that a commercial customer paid for a boxing match on a pay-per-view basis to her satellite provider where the customer failed to pay the exclusive license holder because, "[w]hile she may not have illegally intercepted the satellite signal, she was not authorized to display it to her establishment's patrons").

The Court is not persuaded that Section 553 either always—or never—provides a safe harbor for a commercial customer who pays a residential fee to a cable provider to broadcast a program in exchange for the cable provider's permission to exhibit the program when the cable provider does not have the authority to grant the permission.   The question whether a cable provider "specifically authorize[s]" a commercial customer to exhibit a program cannot be answered by looking to one fact—namely, the payment of a residential fee to the provider in exchange for the provider's permission to receive the broadcast of the program—but rather must be answered by examining all facts relevant to the question of authorization to determine whether the safe harbor applies.   For this reason, the Court declines to construe the cases cited by Plaintiff, including *Lopez*, as providing automatic liability for commercial cable customers who pay a residential fee to their cable providers in exchange for access to the programming.   Likewise, the Court declines to construe *Schmalz* and *Mandell* as providing automatic immunity for commercial cable customers who pay a residential fee to their cable providers in exchange for access to programming.

Rather, to determine whether a cable provider "specifically authorized" a commercial customer to exhibit a program, the Court must examine, among other relevant facts, the terms of

the contract between the cable provider and the defendant.   The language may be relevant to the question of authorization if, for example, as in *Coyne*, *Phoenix*, and *TCOS*, the contract informs the defendant that the cable provider does not have the authority to license pay-per-view programming to commercial clients, or if it requires the defendant to obtain permission from the party actually holding distribution rights to programming in advance of broadcasting the program. This contract language suggests that the cable provider did not "specifically authorize[]" a commercial customer to exhibit a program and must be weighed in conjunction with evidence that the cable provider accepted a fee from a commercial customer in exchange for the right to exhibit the program to determine, along with other evidence relevant to the question of authorization, whether the transmission was "specifically authorized" within the meaning of Section 553.   Other evidence relevant to the question of authorization includes but is not limited to whether the defendant commercial customer was aware—or should have been aware—of the cable provider's limitation on commercial distribution, whether the commercial customer accurately represented itself as a business (and not residential) client, whether the customer was listed as commercial on the provider's records, and whether the customer ordered and paid for the program on its commercial account.   *See, e.g.*, *Schmalz*, 745 F. Supp. 2d at 851.

This methodology is consistent with the framework under which the courts in *Mandell* and *Schmalz* analyzed the applicability of the safe harbor (but not necessarily with the result of those cases).   *See, e.g.*, *Mandell*, 751 F.3d at 350 (explaining that to determine if a cable provider specifically authorized a commercial customer, thereby implicating the safe harbor in Section 553, a court should consider whether the contract between the cable provider and the defendants provided that the operator was obligated to ensure that the services it distributed to the defendants were authorized and made pursuant to the proper license or whether it put the burden on the

commercial customer to obtain the necessary permissions from the party holding the right to distribute the programming); *Schmalz*, 745 F. Supp. 2d at 851 (considering, as part of its inquiry whether a cable provider specifically authorized a commercial customer to exhibit a program, the awareness of the defendants of the cable provider's lack of authority to distribute commercial rights and the language of the underlying contract).   The Court's approach likewise is consistent with the more explicit holdings of the Northern District of California in *J & J Sports Productions v. Coyne*, No. C-10-04206-CRB, 2012 U.S. Dist. LEXIS 30198 (N.D. Cal. Mar. 7, 2012), and the Eastern District of Michigan in *Joe Hand Promotions, Inc. v. Phoenix Promotions, Inc.*, No. 10-15102, 2012 WL 3025107 (E.D. Mich. July 24, 2012).

In *Coyne*, the district court refused to impose either per se liability or absolute immunity from liability on a commercial customer who paid a fee to a cable provider, Comcast Cable, in exchange for pay-per-view programming.   *See* 857 F. Supp. 2d at 911.   The court acknowledged that the commercial customer of the cable provider was listed and represented itself as a commercial establishment, that the customer was not subjectively aware that the cable provider lacked the authority to license the program, and that, when the customer called to inquire whether he could purchase the programming, Comcast Cable failed to inform him that it did not have the authority to license the program to commercial entities.   *See id.*   The *Coyne* court did not consider these facts determinative, however, but rather also, consistent with the approach advocated by this Court, considered the underlying contract between the cable provider and the commercial customer to determine whether the customer *should have been* aware—because of the terms of the contract—that the cable provider lacked authority to grant commercial customers permission to view the programming.   *See id.* at 916.   Because the terms of the underlying agreement between the provider and the customer "made clear that Comcast did not have the right

14

to authorize [the defendant's] dissemination of the Program," the court held that the commercial customer should have been aware that Comcast Cable lacked authority to grant the authorization. *See id.* Therefore, the court held that the cable provider could not "specifically authorize" the defendant to view the program within the meaning of Section 553. *Id.*

Likewise, in *Phoenix Promotions* it was undisputed that the defendants maintained a commercial cable account through Comcast and that the commercial customer did not attempt to represent itself as a residential customer. *See* 2012 WL 3025107, at *1. As in *Coyne*, the *Phoenix* defendants signed a service agreement with Comcast Cable which provided that Comcast did not have the right to distribute pay-per-view video programming to commercial establishments and which obligated the customer to agree that it would not exhibit any such programming unless it obtained written authorization in advance from the party with the distribution rights to the program. *See id.* The defendants claimed that they were unaware of this language in the contract and that they ordered the program from Comcast Cable without realizing that they were required to pay anything more than the residential fee. *See id.* The plaintiff argued that Section 553's safe harbor did not apply because "Comcast did not have the authority to allow Defendants to obtain the Program at the residential rate instead of the commercial rate." *Id.* at *2.

The *Phoenix* court recognized that at least one court—namely, *Schmalz*—refused to hold defendants liable under Section 553, but found the reasoning of at least two other courts—namely *Coyne*, which this Court already has discussed, *see supra* at 14-15, and *J & J Sports Productions, Inc. v. TCOS Enterprises, Inc.*, No. Civ. A. 10-7130, 2012 WL 124482 (E.D. Pa. Jan. 13, 2012)—more persuasive.[5] *See id.* at *3. The *Phoenix* court held that *Coyne* and *TCOS* were

---

[5] In *TCOS*, the court held that a bar ordering a program through its Comcast Cable commercial account was not "specifically authorized" under Section 553 because Comcast's terms and

more compelling because the underlying contracts in *Phoenix* had language similar to the language in those cases.  In all three cases, the underlying contracts notified the commercial customer in advance that the cable provider did not have the right to distribute the programing and placed the onus on the commercial customer to obtain the necessary approval from the license holder.  *See id.*  In contrast, the court distinguished *Schmalz* on the ground that the underlying contract in *Schmalz* required the cable operator to inform the commercial customer that it was not authorized to provide certain programming and to direct the customer to the entity that did possess the rights. *See id.*

The Court's approach is consistent with the methodology of *Phoenix* and *Coyne* as well as with the approach, if not result, of *Schmalz* and *Mandell*.  Like these courts, this Court rejects either automatic liability for commercial customers that fail to pay a mandatory licensing fee to the exclusive distributor of a program's rights or automatic immunity for commercial customers who receive permission from a cable provider to broadcast the transmission.  Instead, the Court examines all of the facts, including any language in the underlying contract, to determine whether the Comcast Cable "specifically authorized" Defendants to receive the cable broadcast.

The Court is not persuaded to hold otherwise by Defendants' argument that, as a matter of law, a commercial customer cannot be "specifically authorized" by a cable provider to broadcast a program if the cable operator itself does not have the authority—*i.e.*, does not hold the right to distribute the program to commercial customers—to grant the permission.  Contrary to Defendants' argument, the question of liability is not answered by examining a single fact:

---

conditions informed the bar that Comcast did not have the right to distribute the pay-per-view program to commercial establishments and because the contract required the bar to obtain authorization in writing prior to exhibiting the pay-per-view program.  *See* 2012 WL 124482, at *2.

namely, whether the cable provider had the authority to grant the commercial customer permission to exhibit the program. Rather, the Court must examine all facts relevant to authorization, including the language of the underlying contract. The safe harbor's "specifically authorized" exception encompasses both authorization received from a cable provider possessing actual authority to grant the permission but also extends protection to an authorization received from a cable provider possessing apparent authority to grant the permission. The Court's interpretation, however, reads the safe harbor as precluding protection for commercial customers who have no basis for concluding that the cable provider had actual or apparent authority to grant the permission, such as when a contract between the provider and the commercial customer specifically informs the customer that the cable operator does not have the right to distribute pay-per-view programming to commercial clients.

Applying this standard to the facts before the Court on summary judgment, the Court holds that Defendants have failed to establish as a matter of law that they are entitled to summary judgment. Although Defendants contend that the safe harbor applies because Comcast Cable granted them permission to receive the broadcast in exchange for a fee, the facts Defendants identify to establish that this permission falls within the definition of Section 553's safe harbor do not satisfy their summary judgment burden. While Defendants provide the Court with some facts relevant to the inquiry whether the safe harbor applies, such as that they were subscribers to Comcast Cable with an account in the business name and at the business address of Goober McCools, that they ordered the fight on their commercial account, that they paid the fee charged by Comcast Cable, that they were not aware of any limitations on Comcast Cable's ability to provide the fight to commercial customers, that they received no commercial gain or economic advantage from broadcasting the fight, and that they did not misrepresent to Comcast Cable,

17

Plaintiff, or any other third parties the location at which they received Comcast's cable services or the purpose of receiving cable services on April 21, 2012.   Defendants, however, do not present evidence of their underlying contract with Comcast Cable.   Without knowing whether the terms and conditions of the contract contain the same language as the Comcast Cable contracts at issue in *Coyne*, *Phoenix*, and *TCOS*—namely, that the cable provider was not authorized to license pay-per-view programming to commercial customers and that commercial customers agreed to obtain written authorization from the party holding the licensing rights prior to exhibiting the pay-per-view program—the Court holds that a question of fact precludes summary judgment. Thus, the Court denies Defendants' motion for summary judgment on Plaintiff's Section 553 claim.

<u>**CONCLUSION**</u>

For the foregoing reasons, **IT THEREFORE IS ORDERED** that Defendants' Motion for Summary Judgment [Doc. 18], filed April 18, 2014, is GRANTED IN PART and DENIED IN PART as follows:

(1)     Defendants' Motion for Summary Judgment is granted to the extent it seeks judgment as a matter of law on Plaintiff's 47 U.S.C. Section 605 claim; and

(2)     Defendants' Motion for Summary Judgment is denied to the extent it seeks judgment as a matter of law on Plaintiff's 47 U.S.C. Section 553 claim.


Dated this 26th day of March, 2015.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE